# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

RICHARDSON M. ROBERTS,    )
    )
    Plaintiff,    )    **Case No. 3:06-0055**
    )    **Judge Trauger**
v.    )
    )
FINANCIAL TECHNOLOGY, VENTURES,    )
L.P.; FINANCIAL TECHNOLOGY    )
VENTURES II, L.P.; FINANCIAL    )
TECHNOLOGY VENTURES(Q), L.P.;    )
FINANCIAL TECHNOLOGY VENTURES    )
ii (Q), L.P.,    )
    )
    Defendants.    )

## MEMORANDUM

The defendants have filed a Motion for Summary Judgment (Docket No. 117), to which

the plaintiff has responded (Docket No. 144), and the defendants have replied (Docket No. 156).

In addition, the court will consider the plaintiff's Motion to Certify Question of Law (Docket

No. 123). For the reasons discussed herein, the defendants' Motion for Summary Judgment will

be granted, and the defendants' Motion to Certify Question of Law will be denied as moot.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises from an oral agreement between the plaintiff, Richardson M. Roberts,

and the defendants, the Financial Technology Ventures entities ("FTV"), through the

representation of Richard N. Garman, the managing partner of FTV.[1]  At the time this agreement

---

[1]Unless otherwise noted, the facts have been drawn from the plaintiff's Complaint
(Docket No. 1), the plaintiff's Response to Defendant's Motion for Summary Judgment (Docket
No. 144), the plaintiff's Response to the defendants' Concise Statement of Facts (Docket No.
147), and the plaintiff's Concise Statement of Additional Material Facts (*Id.*)

1

was made, Mr. Roberts was the Chief Executive Officer and Chairman of Verus Financial Management, Inc. ("Verus"), a credit-card payment processing company, and controlled approximately 17% of its stock. FTV, a venture capital firm based in San Francisco, California, controlled approximately 40% of Verus' stock. Both Mr. Roberts and Mr. Garman served on the Verus board of directors from August 2005 through February 2006.

The oral agreement was made over dinner at a hotel in San Francisco in August 2005. Although the specific terms of this agreement are in dispute, the parties agree, for the purposes of the pending motions, that in exchange for $10 million, the plaintiff promised to put Verus up for sale. The $10 million was to be paid either by the entity that ultimately bought the company or by FTV, after the transaction was completed.

In essence, the plaintiff agreed to support an action with significant consequences to Verus and its shareholders that he otherwise would not have supported, in exchange for $10 million. At his deposition, the plaintiff testified that he would not, as CEO and director, have put Verus up for auction without this promise because "[w]e were growing rapidly, [and] I was going through a divorce." (Roberts Dep. 66:3-9) In addition, Roberts testified that he thought Verus "was growing fast" such that delaying the sale to a later date might result in a higher selling price. (*Id*. at 121:19-21)

The parties dispute whether the plaintiff agreed explicitly to sell the shares that he owned in the company at the August dinner; however, the plaintiff has admitted numerous times that he could not have effectively executed his side of the oral agreement without doing so. (*Id*. at 73:10-17) ("I got to sell my shares to be able to sell Verus . . . I cannot sell Verus without selling my shares."); (Complaint, Docket No. 1 at ¶ 14 ("Garman then made the following offer on

2

behalf of FTV: if Roberts would agree to sell his shares in Verus and place Verus on the market in Fall 2005, FTV would pay Roberts $10 million . . . from the proceeds of the sale of Verus."); (Roberts Aff., Docket No. 4 at ¶ 6) ("Since I was Chairman and CEO of Verus as well as a major shareholder (along with FTV), my agreement to sell my stock was required.")

In light of these admissions, whether or not the parties explicitly discussed the plaintiff's sale of his personally owned shares at the dinner appears to be a distinction without a difference. (*See* Roberts Dep. at 73:22-74:3) ("I said I would sell the company and that the agreement was based upon a sale of Verus which to me just assumes that I got to sell my shares, too.")[2]

In the weeks following the August meeting, Mr. Roberts took steps to sell Verus by formally engaging an investment banking firm and contacting potential buyers. On September 1, 2005, Mr. Roberts wrote a letter to Ron Verni, the CEO of Sage Group, PLC ("Sage"), a British company that provides accounting and business management software to small and medium-sized companies, requesting that Mr. Verni submit a bid to purchase shares of Verus "sooner rather than later." On December 16, 2005, Verus received a $325 million bid from Sage Group, PLC ("Sage"), to merge with Verus in a stock-purchase deal. On December 20, 2005, Mr. Garman traveled to Nashville to discuss the parameters of the deal with Verus employees, including Mr. Roberts. During this time, Verus submitted a counter-offer to Sage, raising the

---

[2]On this point the court is also reminded that "[a]dmissions or statements a party makes in the course of litigation bind that party upon a motion for summary judgment." *Curb v. MCA Records, Inc.*, 898 F. Supp. 586, 590-91 (M.D. Tenn. 1995). Inasmuch as the plaintiff currently seeks to disavow his earlier statements that his requirements under the oral agreement encompassed selling his own shares, he is barred from doing so. *See Ferguson v. Neighborhood Housing Services of Cleveland, Inc.*, 780 F.2d 549, 551(6th Cir. 1986) ("This court has observed that '[u]nder federal law, stipulations and admissions in the pleadings are generally binding on the parties and the Court.'") (quoting *Brown v. Tennessee Gas Pipeline Co.*, 623 F.2d 450, 454 (6th Cir. 1980)).

3

overall price an additional $15 million.  Sage rejected this counter-offer, and the parties ultimately agreed to the $325 million price.

When Mr. Garman flew to Nashville, Mr. Roberts picked him up at the Tune Airport, and Mr. Garman stayed at Mr. Roberts' house that evening.  Mr. Garman and Mr. Roberts had discussions about the Sage offer with other Verus executives at the headquarters and later at dinner.  The $10 million oral agreement was not discussed at these meetings.  However, Mr. Roberts did raise the issue with Mr. Garman in private, at Mr. Roberts' home.  According to Mr. Garman, he declined to have substantive discussions with Mr. Roberts about the $10 million payment at that time because the "exact terms of the transaction" were not yet formalized.  Mr. Roberts told Mr. Garman that he would have a lawyer contact Mr. Garman to get their agreement in writing and, a few days after the visit, Mr. Roberts sent Mr. Garman an e-mail requesting that he "hard coat" their "deal," since the merger with Sage was "at the eleventh hour."  Over the holidays, both Mr. Roberts and his attorney made several calls to Mr. Garman; however, Mr. Garman returned only one of these calls.  During that call, Mr. Garman told Mr. Roberts that there was nothing to talk about until Sage's price was certain.

On January 4, 2006, in response to another e-mail, Mr. Garman telephoned Mr. Roberts and disavowed that FTV owed Mr. Roberts $10 million.  According to Mr. Garman, his stated position during this call was that FTV had no such obligation because Mr. Roberts would receive more than $50 million in total proceeds from the stock transaction, and the $10 million "side payment" had been contingent on a lower price.  The plaintiff disputed that interpretation of the oral agreement.

Notwithstanding this dispute, Mr. Roberts voted his shares in favor of the merger and

4

sold his personal shares in Verus.  On January 8, 2006, Mr. Roberts executed the Agreement and

Plan of Merger with Sage and also signed a Voting Agreement in favor of the merger.  On

January 23, 2006, Mr. Roberts signed the Letter of Transmittal, which all stockholders were

required to sign in order to receive consideration for their shares.  Three days later, on January

26, 2006, the plaintiff filed this case, alleging (1) breach of contract, (2) promissory estoppel, (3)

quantum meruit, and (5) fraud.  In addition to compensatory and punitive damages, the plaintiff

requested emergency and injunctive relief requiring that the defendants place the funds relevant

to this case in escrow pending the outcome of the litigation and filed, contemporaneous with his

complaint, a motion for a temporary restraining order to that effect.  (Docket No. 2)  On January

31, 2006, Magistrate Judge Haynes denied the plaintiff's motion for a temporary restraining

order.  (Docket No. 24) On or about February 1, 2006, Mr. Roberts signed a second Letter of

Transmittal and, on February 6, 2006, the merger became effective.  After a lengthy evidentiary

hearing held on July 10, 2006, the court ruled on issues of jurisdiction and the effect of a release

that Mr. Roberts signed in conjunction with the merger.  (Docket No. 71)  On June 18, 2007, the

defendant moved for summary judgment.  (Docket No. 117)

## ANALYSIS

### I.        Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted

if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the

moving party must demonstrate the absence of a genuine issue of material fact as to an essential

5

element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To avoid summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact

6

must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to an analysis of the plaintiff's claims.

## II.     Choice of Law

Because this case arises under the court's diversity jurisdiction, the court must apply state law to all substantive issues, *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938), and, in determining what substantive law applies, the court must first examine the forum state's choice of law rules. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1977); *see also Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818, 821 (6th Cir. 1977). To the extent that any procedural issues arise in this case, the law of the forum state, Tennessee, applies. *Mackey v. Judy's Foods, Inc.*, 867 F.2d 325, 328 (6th Cir. 1989) (citing *Whitfield v. City of Knoxville*, 756 F.2d 455, 461 (6th Cir. 1985). Accordingly, the court will examine Tennessee's choice of law rules for each substantive legal issue to determine what law applies.

### A.     Whether the Oral Agreement Violates the Plaintiff's Duty of Loyalty

The defendants allege that the oral agreement cannot support any of the plaintiff's causes of action because it violated the plaintiff's duty of loyalty to Verus.[3] The parties agree that, under the "internal affairs" doctrine, Delaware law applies in determining the scope of Mr. Roberts' fiduciary duties to Verus. In addition, the court finds that, under the "internal affairs" doctrine, Delaware law must also, by necessity, determine whether or not the plaintiff's violation of his duty of loyalty renders the contract "illegal." However, because the liability of a

_____

[3]Because the court finds that the illegality of the contract is dispositive for all of the plaintiff's claims, it need neither consider the construction of 8 Del. Code Ann. § 218(c) nor certify that question to the Delaware Supreme Court. Accordingly, it will deny the defendants' Motion to Certify as moot.

7

corporation to a third person for acts that could be done by an individual are determined by the same choice-of-law principles as would be applied to non-corporate parties, the effect of illegality on the enforcement of the contract and on the plaintiff's fraud claim will be determined by Tennessee's choice of law rules for contract and tort claims, respectively.  *See* Restatement (Second) of Conflict of Laws § 301 (1971).

Under Tennessee's interpretation of the "internal affairs" doctrine, "matters involving the internal affairs of a foreign corporation are deemed substantive in nature and 'should be resolved in accordance with the law of the state of incorporation.'" *Hicks v. Lewis*, 148 S.W.3d 80, 84 (Tenn. Ct. App. 2003) (quoting *Bayberry Assocs. v. Jones*, No. 87-261-II, 1988 WL 137181, at *4 (Tenn. Ct. App. Nov. 9, 1988), *vacated on other grounds*, 783 S.W.2d 553 (Tenn. 1990). Internal affairs of corporations "involve matters peculiar to corporations such as the relationships among the corporation and its officers, directors and stockholders." *Bayberry Assocs.*, 1988 WL 137181 at *4 (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).  Therefore, "[c]laims involving the breach of an officer's or a director's fiduciary duty come within the scope of the internal affairs rule." *Id.* (citing *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1527 (9th Cir. 1985) ("Claims involving 'internal affairs' of corporations, such as the breach of fiduciary duties, are subject to the laws of the state of incorporation.")); *see also* Restatement (Second) Conflict of Laws § 309 (1969) (providing that the local law of incorporation applies to determine "the existence and extent of a director's or officer's liability to the corporation," unless some other state has a more significant relationship).

It is the plaintiff's fiduciary relationship to Verus (although that company is not a party in this case) that could render illegal his oral agreement with the defendants.  Verus, although its

8

headquarters are in Tennessee, was incorporated under the laws of Delaware. On that basis, the parties agree that the scope of the plaintiff's fiduciary duties to Verus is to be determined by Delaware law. However, under the "corporate affairs" doctrine, it is not just the scope of the plaintiff's fiduciary duties, but also whether those duties would render the oral agreement illegal, that must be determined under Delaware law. Put another way, the inquiry into the scope of the plaintiff's duties must necessarily include determining whether those duties render the contract in this case illegal.

In a typical case, where breach of fiduciary duties is raised as a cause of action against an officer or director, it is not merely the boundaries of the duties themselves that are governed by the law of incorporation but, in addition, "the existence and extent of liability." Restatement (Second) Conflict of Laws § 309 (1969); *see also Bayberry Assocs.*, 1988 WL 137181 at *4-5 (holding that both the parameters of the defendant's fiduciary duties and the application of those fiduciary duties to the standing issue were to be determined by the law of incorporation); *Nagy v. Riblet Products Corp.*, 79 F.3d 572, 576 (7th Cir. 1996) ("[T]he liability of corporate investors and directors for intra-corporate affairs almost invariably depends on the law of the place of incorporation."). In the case at hand, the plaintiff's breach of his fiduciary duties has been raised as a defense; nevertheless, under the "internal affairs" doctrine, it is not just the boundaries of the duties themselves, but the legal implications of those boundaries that should be governed by Delaware law. Put more simply, if, in a cause of action for breach of fiduciary duty, Delaware law would apply to both the parameters of the fiduciary duty *and* liability then, in the present setting, it should apply not only to those parameters, but also to their effect on the legality of the contract at issue.

9

Therefore, an analysis of the "scope" of the plaintiff's fiduciary duties cannot be divorced from the legal effect of those duties on the oral agreement, and Delaware law will be applied both in defining the fiduciary duties and in determining whether the oral agreement was illegal. However, we must also keep in mind that the illegality of the contract is conceptually distinct from the effect of that illegality on the plaintiff's causes of action. This point is well illustrated by the fact that, under certain exceptional conditions, an illegal contract may give rise to causes of action sounding in both contract and tort law. *See R.T. Tiedje v. Aluminum Taper Milling Co.*, 296 P.2d 554, 556 (Cal. 1956); *see also* Restatement (Second) Conflict of Laws § 202 (1971), comment c (explaining, in the non-corporate setting, that "[a] distinction must . . . be drawn between the effect of illegality upon the validity of the contract and the existence of illegality as such").

The Restatement (Second) distinguishes matters that fall within and without the "internal affairs" doctrine in the following way:

> The rights and liabilities of a corporation with respect to a third person that arise from a corporate act of a sort that can likewise be done by an individual are determined by the same choice-of-law principles as are applicable to non-corporate parties.

Restatement (Second) of Conflict of Laws § 301 (1971). The comments to that section explain that "corporations and individuals alike make contracts, commit torts and receive and transfer assets." *Id.*, comment b. Legal issues involving such actions, "when done by a corporation are determined by the same choice-of-law principles as are applicable to non-corporate parties," even though "the corporation is forbidden by general statute or by common law rule of the state of incorporation to do the particular act." *Id.*

The contract at issue in this case was made between FTV and Mr. Roberts, who is not a

10

director or corporate officer of FTV. Although several FTV employees were, at the time, on the Verus board of directors (along with Mr. Roberts), the oral agreement was not an "internal affair" of Verus. Rather, it was an agreement between the defendants—a group of corporations—and Mr. Roberts, an individual third party. Therefore, although the corporate affairs doctrine governs as to whether Delaware law forbids the plaintiff from entering into the oral agreement—that is, whether the agreement is illegal—it does not govern as to the merits of the plaintiff's contract and tort claims. Accordingly, the court will consult Tennessee's choice of law rules for contract and tort actions.

### B. The Plaintiff's Contract Claims

Under Tennessee's choice of law rules, "the validity of a contract and the substantive rights of the parties to the contract are governed by the law of the state contemplated by the parties." *Mackey v. Judy's Foods, Inc.*, 867 F.2d 325, 328 (6th Cir. 1989). Where there is no evidence indicating that the parties intended otherwise, "the parties are presumed to have intended to contract pursuant to the laws of the state in which the contract was entered into." *Id.*; *see also Ohio Cas. Ins. Co. v. Travelers Indem., Co.*, 493 S.W.2d 465, 466-67 (Tenn. 1973); *KW Bankshares, Inc. v. Syndicates of Underwriters at Lloyd's*, 965 F. Supp. 1047, 1051 (W.D. Tenn. 1997).

The parties entered into the oral agreement in San Francisco, California, and there is no evidence showing that either the plaintiff or the defendants intended that any other law should apply to their agreement. Accordingly, although the illegality of the agreement will be determined according to Delaware law, the impact of that determination on the plaintiff's contract causes of action will be determined according to California law.

11

### C.      The Plaintiff's Fraud Claim

Tennessee has adopted the balancing test enumerated in the Restatements (Second) for all tort actions. *See Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992) ("Our review of the various conflicts approaches persuades us that the better-reasoned rule for resolving conflicts questions in tort cases is the approach of the Restatement (Second).").

Under the Restatement (Second) approach, the court should apply the "law of the state where the injury occurred . . . unless, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties."  Restatement (Second) of Conflicts of Laws §§ 146, 175 (1971)).  In determining what state has the more significant relationship, the court is to weigh the following factors:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties,
>
> (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflicts of Laws § 145 (1971); *see also Hataway*, 830 S.W.2d at 59.

The Restatement (Second) provides, in actions for fraud and misrepresentation, the following additional factors for the situation where "the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made":

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,

12

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148 (1971); *see also Kelly v. International Capital Resources, Inc.*, 231 F.R.D. 502, 516-17 (M.D. Tenn. 2005) (applying the additional fraud factors in determining choice-of-law to promissory fraud causes of action).

Among the three potential sources of substantive law, the court finds that Tennessee is the most appropriate under these factors. The place where the injury occurred, inasmuch as any single place can be identified, appears to be Tennessee. The plaintiff's injury is that he did not receive $10 million in addition to the compensation he did receive from the merger. Although it can be said that the plaintiff did not receive $10 million in Tennessee, it can also be said that he did not receive $10 million in California or in Delaware. However, the plaintiff resided in Tennessee throughout the relevant period of this lawsuit and was in Tennessee when he was first informed, via telephone, that FTV did not plan to pay him $10 million. In addition, Tennessee appears to be the place where the plaintiff acted in reliance on the promise. The plaintiff conducted business in Tennessee, attended meetings with Mr. Garman and other officers regarding the merger, and wrote at least one letter from that location in furtherance of selling Verus.

The conduct causing the injury, which is also the place where the plaintiff received the representations and the place where the defendant made the representations, is California. However, outside of hosting one meeting between the plaintiff and Mr. Garman over dinner, that

13

forum is not very central to the action of this case. The defendants are located in California but are incorporated under Delaware law. The plaintiff is a Tennessee resident. Verus—the subject matter of the agreement—is headquartered in Tennessee but is incorporated under Delaware law. Finally, the place where the relationship between the parties is centered appears to be Tennessee. Due to the fact that Verus is headquartered in Tennessee, the bulk of the meetings in which the parties discussed and ultimately approved the merger of Verus into Sage occurred in Tennessee. Although the oral agreement was born in California, the actions in furtherance of the agreement and the discussions between the parties about the agreement all appear to have either occurred in Tennessee, or via e-mail and phone conversations conducted while the plaintiff was in Tennessee. Accordingly, although three different states can assert some interest in this matter, the court finds that Tennessee has the most significant relationship to the plaintiff's tort cause of action. The plaintiff's fraud claim will be analyzed under Tennessee law.

**III.     The Illegality of the Oral agreement**

Under Delaware law, directors and officers of corporations owe a duty of loyalty that "requires a director [or officer] to act in good faith and in the honest belief that the action taken is in the corporation's best interests." *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1316-17 (3d Cir. 1993) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)). A breach of this duty occurs whenever "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation." *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006) (citing *In re the Walt Disney Company Derivative Litig.*, 906 A.2d 27, 66-67 (Del. Supr. 2006)).

Delaware courts have elaborated that "[e]ssentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed

by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (citing *Pogostin v. Rice*, Del. Supr., 480 A.2d 619, 624 (Del. 1984); *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)). Further, "[c]lassic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally." *Cede & Co.*, 634 A.2d at 632.; *see also Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 191 (Del. Ch. 2005).

In securing a $10 million side payment as consideration for taking a corporate action that he otherwise would not have taken, the plaintiff committed a classic breach of his fiduciary duty of loyalty. The situation is very simple. Either the plaintiff believed that putting Verus up for sale was in the best interest of the corporation, or he did not. Assuming, as he testified, that the plaintiff did not think that this action was in the best interest of the corporation—a professional opinion that dovetailed nicely with his own personal interests relating to his pending divorce—then the plaintiff took an action (in his capacity as CEO) that he did not think was in the best interest of the corporation in exchange for $10 million from a group of investors. This was an egregious breach of the plaintiff's duty of loyalty. *See Cantor v. Perelman*, 414 F.3d 430, 436 (3d Cir. 2005) (applying Delaware law) ("A corporate fiduciary receiving a 'personal benefit not received by the shareholders generally' is a 'classic' example of a breach of the duty of loyalty.") (quoting *Cede & Co.*, 634 A.2d at 362); *see also McCall v. Scott*, 239 F.3d 808, 824-25 (6th Cir. 2001) (applying Delaware law) ("The duty of loyalty requires that the best interests of the corporation and its shareholders take precedence over any self-interest of a director, officer, or controlling shareholder that is not shared by the stockholders generally.");

15

*Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

Likewise, if the plaintiff did, in fact, believe that the action was in the best interest of the corporation but, nevertheless, refused to undertake the action without some extra personal incentive, that too would be an egregious breach of his duty of loyalty. This point is well illustrated by *Lacos Land Company v. Arden Group, Inc.*, 517 A.2d 271, 277-79 (Del. Ch. 1986). In *Lacos Land*, shareholders brought a derivative action seeking to override a proposed recapitalization authorized by a shareholder vote at the company's most recent annual meeting. *Id.* at 273. The court held that the vote was likely to be found to be fatally flawed and the proposed amendments voidable, because it was "inappropriately affected by an explicit threat of Mr. Briskin [the CEO] that unless the proposed amendments were approved, he would use his power (and not simply his power qua shareholder) to block transactions that may be in the best interests of the Company, if those transactions would dilute his ownership interest" in the company. *Id.* at 276.

The court in *Lacos Land* reasoned that, "[i]n form at least, the statement by a director and officer that he will not give his support to a corporate transaction unless steps are taken to confer a personal power or benefit, suggests an evident disregard of duty." *Id.* at 278. However, the court conceded that the CEO's threat might have been motivated selflessly, by a sincere belief that the proposed action was in the best interest of the corporation. *Id.* Nevertheless, the court found that, "[a]s a corporate fiduciary, Mr. Briskin ha[d] no right to take such a position, even if benevolently motivated in doing so." *Id.*; *see also In re Tyson Foods, Inc. Consolidated Shareholder Litigation*, 919 A.2d 563, 594 (Del. Ch. 2007) ("A director who intentionally uses inside knowledge not available to shareholders in order to enrich employees while avoiding

16

shareholder-imposed requirements cannot, in my opinion, be said to be acting loyally and in good faith as a fiduciary."); *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 935 (Del. 2003) ("A stockholder vote may be nullified by wrongful coercion 'where the board or some other party takes actions which have the effect of causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction.'") (quoting *Williams v. Geier*, 671 A.2d 1368, 1382-83 (Del. 1996)).

The present case differs from *Lacos Land* only in so much as there is no possibility that the plaintiff was motivated selflessly when he demanded $10 million in exchange for his efforts in selling the company. The facts of this case support the conclusion that Mr. Roberts threatened not to support a stock sale without extra compensation. Mr. Roberts did not make his demand in furtherance of achieving a shareholder vote but, instead, he extracted a payment that should have been dispersed to the shareholders themselves as part of the merger deal.[4] Moreover, the case at hand does not involve a collateral attempt to reverse the shareholder vote in favor of the merger. Instead, this is a much simpler matter, brought by the plaintiff to enforce payment.

This last point is an important one. Although Delaware courts require an extra showing of unfairness in order to sustain a collateral attack on a stock merger deal where a director or officer has breached his fiduciary duties by demanding extra compensation to support the deal, *see, e.g., Parnes v. Bally Entertainment Corp.*, 722 A.2d 1243, 1246-47 (Del. 1999), *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 980-83 (Del. Ch. 2000)[5], this does not

---

[4]The likely result of the defendants' breach of the oral agreement is that the $10 million was, in fact, dispersed among the shareholders, as Mr. Robert's fiduciary duties command.

[5]In *Parnes*, Arthur Goldberg, the CEO of Bally Entertainment Co., demanded a termination payment of $21 million and other asset transfers in return for supporting a merger. 772 A.2d at 1246. The court found that, "[i]f, as [the plaintiff] claims, Goldberg tainted the

mean that the demand for such payment does not, in every case, constitute a breach of the director or officer's fiduciary duties. It does. *See Cede & Co.*, 634 A.2d at 362.

The consequence of the plaintiff's breach of his duty of loyalty is that the oral agreement between the parties is illegal. *See Ace Limited v. Capital Re Corp.*, 747 A.2d 95, 105 (Del. Ch. 1999). Perhaps because agreements such as the parties entered in this case are often described as "classic" breaches of fiduciary duties, the Delaware courts do not appear to have often faced direct enforcement actions of such agreements; instead they are most often challenged collaterally, in shareholder actions seeking to prevent or overturn corporate mergers. *See, e.g., Parnes*, 722 A.2d at 1246; *Crescent/Mach I Partners*, 846 A.2d at 892; *Cede & Co.*, 634 A.2d at 362. However, *Ace Limited* appears to have addressed a situation somewhat similar to the case at hand.

In *Ace Limited*, the plaintiff sought a Temporary Restraining Order barring the defendant, Capital Re Corp., from terminating a merger agreement between the two companies. 747 A.2d at 97. The court found that the language of the agreement did not bar the defendant from terminating it when presented with a more advantageous offer; however, the court also found

---

entire process of finding an interested merger partner and negotiating the transaction by demanding a bribe, then it is inexplicable that independent directors, acting in good faith, could approve the deal." *Id.* at 1247. In *Crescent/Mach I Partners*, the court found that allegations that Turner, the CEO of Dr. Pepper Bottling Holdings, Inc., had "negotiated a merger agreement that conferred substantial benefits to him that [would] not be available to [the] minority stockholders" suggested that Turner "may have breached his fiduciary duty of loyalty." 846 A.2d at 982. The court held that the plaintiff had adequately pled a claim challenging the entire merger transaction because the approval of the remaining directors of the side-deals could "taint the entire merger process and strip[] the board of the protection of the business judgment rule." *Id.*; *see also In re: Ply Gem Industries, Inc. Shareholder Litigation*, No. CIV.A. 15779-NC, 2001 WL 755133 at *5-6 (Del. Ch. 2001) (holding that, in order to state a derivative claim challenging the validity of an entire corporate transaction, "*Parnes* makes clear that the test is whether the alleged breaches of fiduciary duties resulted in unfair price and/or unfair process").

that, if the agreement were to be construed to prevent such an action, it would be illegal and, therefore, unenforceable. *Id*. at 104-05. The court cited the Restatement (Second) of Contracts for the rule that a "promise by a fiduciary to violate his fiduciary duty *or a promise that tends to induce such a violation is unenforceable on public policy grounds*." *Id*. at 104 (quoting Restatement (Second) of Contracts § 193) (emphasis in original). Under Delaware law, a no-shop provision could not validly define or limit the fiduciary duties of the directors. *Id*. at 205. Therefore, the court held that, "[t]o the extent that a contract, or a provision thereof, purports to require a board to act or not to act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable." *Id*.

Although *Ace Limited* involved an entire merger agreement including only one provision that (under one interpretation) violated the directors' fiduciary duties, its holding is quite relevant to the case at hand. Under *Ace Limited*, an agreement that entails the violation of a fiduciary duty is invalid and cannot be enforced by the court.[6] The Massachusetts Court of Appeals addressed a similar issue in *Geller v. Allied-Lyons*, 674 N.E.2d 1334, 1336-38 (Mass. App. Ct. 1997). In *Geller*, the plaintiff, a former senior vice president of Dunkin Donuts, Inc., sued to enforce an oral agreement that he would receive a "finders fee" for having aided his company in finding a purchaser. *Id*. at 121. The court held that no such agreement could be enforced, reasoning that "a contract for personal gain which could cause a corporate fiduciary to breach his or her fiduciary duty of loyalty to the corporation is generally held to be unenforceable as against public policy." *Id*. at 123.

---

[6]As discussed above, in the case at hand, California law applies as to the enforceability of the plaintiff's illegal contract. *Ace Limited* holds that, under Delaware law, such an agreement is both invalid and unenforceable. The merits of the plaintiff's contract claims under California law will be analyzed below.

19

Under this body of precedent, the court finds that the plaintiff's contract is illegal under Delaware law, constituting a blatant violation of his fiduciary duty of loyalty to Verus. Under his own admissions, the plaintiff extracted a payment from another shareholder in exchange for supporting, as CEO, an action that he otherwise did not think was in the best interest of the shareholders. If the court were to find that the action was, in fact, in the best interest of the shareholders, that would mean that the plaintiff extracted a payment from another shareholder by threatening not to support an advantageous corporate action. In either event, the plaintiff breached his duty of loyalty by entering into this agreement.

## IV.    The Plaintiff's Contract Claims

The plaintiff seeks to enforce his illegal promise under contract, promissory estoppel, and *quantum meruit* causes of action. Each one of these claims fails. Under California law, "[a] contract made contrary to public policy or against the express mandate of a statute may not serve as the foundation of any action, either in law or in equity . . . , and the parties will be left, therefore, where they are found when they come to a court for relief." *R.T. Tiedje v. Aluminum Taper Milling Co.*, 296 P.2d 554, 556 (Cal. 1956) (citing *Hooper v. Barranti*, 184 P.2d 688, 691 (Cal. 1947); *Brooks v. Brooks*, 147 P.2d 417, 418 (Cal. 1944)); *see also WRI Opportunity Loans II LLC v. Cooper*, 154 Cal. App. 4th 525, 544 (2d Dist. 2007) ("[A]s a general rule, '[b]ecause an illegal contract is void, it cannot be ratified by any subsequent act, and no person can be estopped to deny its validity.'" (quoting 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts § 455, pp. 497-98); *Wong v. Tenneco, Inc.*, 702 P.2d 570 (Cal. 1985) ("No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out . . .") (internal quotations omitted); *R.M. Sherman Co.,*

*Inc., v. W.R. Thomason, Inc.*, 191 Cal. App. 3d 559, 579 (1st Dist. 1987) ("If the contract was truly void it created no right or claim whatsoever:  'A void contract is no contract at all; it binds no one and is a mere nullity.'") (quoting *Guthman v. Moss*, 150 Cal. App. 3d 501, 507 (2d Dist. 1984).[7]

The California courts have carved out several exceptions to this general rule; however, none of those exceptions applies to the case at hand.  For instance, California courts will grant an exception where "the illegality of a bargain is due to facts of which one party is justifiably ignorant and the other party is not."  *R.T. Tiedje*, 296 P.2d at 454.  In addition, exceptions may be granted where the policy of the violated statute would be better served by granting relief, or where the party seeking to enforce the contract is less at fault than the party seeking to uphold the contract.  *Id.*; *see also R.M Shermon Co., Inc.*, 191 Cal. App. 3d at 580 (citing *Lewis & Queen v. N.M. Ball Sons*, 308 P.2d 713, 724 (Cal. 1957); *Severance v. Knight-Counihan Co.*, 177 P.2d 4, 9 (Cal. 1947)).

None of those exceptions fits the fact pattern that is before the court.  As a CEO of a public corporation, the plaintiff should be well aware of the duty of loyalty imposed by the law of

---

[7]A similar result would issue under either Delaware or Tennessee law.  Delaware follows the rule of the Restatement (Second) of Contracts that "[a] promise by a fiduciary to violate his fiduciary duty or a promise that tends to induce such a violation is unenforceable on grounds of public policy."  Restatement (Second) of Contracts § 193 (1981); *see also Ace Limited*, 747 A.2d at 104.  In Tennessee, "[t]he authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract."  *Whitley v. White*, 140 S.W.2d 157, 161 (1940) (quoting *McMullen v. Hoffman*, 147 U.S. 639, 654 (1899)).  In addition, "[g]enerally, ratification, equitable estoppel, or waiver cannot support the enforcement of an agreement contrary to public policy."  21 Tenn. Prac. Contract Law and Practice § 7:8 (2007); *see also Lane v. Sumner County*, 298 S.W.2d 708, 711 (Tenn. 1957) (holding that the principles of waiver and estoppel were "not applicable" in a case involving an illegal contract); *Roberts v. Houston*, 970 S.W.2d 488, 490 (Tenn. App. 1997) ("[A]s a general rule, where a cause of action is based upon an illegal contract, recovery cannot be had on a quantum merit [sic].") (citing *Hotel v. Ewing*, 138 S.W. 954 (1911)).

the state of incorporation.  Neither can it be said that granting the plaintiff relief would, in any way, further the policy reflected in Delaware's fiduciary duty jurisprudence.  Quite to the contrary, the plaintiff's oral agreement stands squarely in the face of that jurisprudence, which serves to protect corporate shareholders from actions such as the plaintiff has taken.  The policy behind Delaware's fiduciary duty jurisprudence is best served by refusing to enforce the oral agreement in any way.

Finally, the facts do not show that the defendants were more at fault than the plaintiff. Although the defendants were at fault in offering to pay the plaintiff $10 million to support selling Verus at the time they preferred, in refusing to honor that agreement, the defendants may have saved the merger deal from an attack by third-party shareholders.  The $10 million originally promised to the plaintiff appears to have been incorporated into the overall bidding price offered by Sage, which is where that money belonged in the first place.  The plaintiff, in his continued insistence on his "chinn-up" payment—even going so far as to offer other directors a split of the money in return for their support—reveals himself to have been the party most at fault.  This case presents no impetus for the court to stray from California's general rule.  *Accord Equitex, Inc. v. Ungar*, 60 P. 3d 746, 750 (Colo. App. 2002) ("A court will not enforce a contract that violates public policy even if the failure to do so is 'unfair' to one of the parties . . ."); *Arcidi v. Nat'l Assoc. of Gov. Employees, Inc.*, 856 N.E. 2d 167, 171 (Mass. 2006) ("[T]he general rule is that a court leaves parties to an illegal contract in the same position as it finds them."); *Design Development, Inc. v. Brignole*, 570 A.2d 221, 223 (Conn. App. 1990) ("When the illegality, either in whole or in part, is in the thing which the party seeking to recover was to do, then there can be no recovery upon a quantum meruit.") (quoting *McKnight v. Gizze*, 175 A. 676, 677 (1934)).

Accordingly, under California law, the court cannot grant the plaintiff relief under contract, promissory estoppel, or quantum meruit theories of recovery. The court will grant summary judgment as to those claims.

## V. The Plaintiff's Fraud Claim

The court must finally address whether the plaintiff may obtain relief on his illegal contract under a fraud cause of action. He cannot. The stricture that "no court will lend its assistance in any way towards carrying out the terms of an illegal contract," *Whitley v. White*, 140 S.W.2d at 161(quoting *McMullen v. Hoffman*, 147 U.S. at 654), does not appear to be limited to actions arising on a contract or quasi-contract theory, but instead to all potential causes of action. *See also Ledbetter v. Townsend*, 15 S.W.3d 462, 464 (Tenn. Ct. App. 1999) ("It is well settled that the courts of Tennessee will not enforce obligations arising out of a contract or transaction that is illegal."); *Cummins v. McCoy*, 125 S.W.2d 509, 514-15 (holding that a side agreement between stockholders disallowed by the charter and by-laws of a corporation was void and unenforceable); *accord Franklin v. Nat C. Goldstone Agency*, 204 P.2d 37, 40 (Cal. 1949) ("A party to an illegal contract or an illegal transaction cannot come into a court of law and ask it to carry out the illegal contract *or to enforce rights arising out of the illegal transaction*.") (emphasis added) (quoting *Wise v. Radis*, 74 Cal. App. 765, 775 (2d Dist. 1925)); *Mountain Fir Lumber Co., Inc. v. Employee Benefits Insurance Co.*, 679 P.2d 296, 300 (Or. 1984) ("One does not have a right to rely on a promise made in violation of a statute in an action for deceit."). The parties have cited no case in which a Tennessee (or California or Delaware) court has enforced an illegal contract through an action for fraud in the inducement, and this court has found none on its

23

own.[8]

In other jurisdictions, in cases where the fraud consists in "deceiving the plaintiff as to the unlawful character of the transaction," courts have held that the plaintiff may introduce evidence of such fraud to show that he or she was not in *pare delicto*, giving rise to an action under a contract theory. *See* 8 Williston on Contracts § 19:80; *Horticultural Development Co. v. Schneider*, 145 So. 135, 135-36 (Ala. 1932) (holding that, where the plaintiff alleged that he was induced to sign a contract by fraudulent conduct that withheld the illegality of the agreement, the plaintiff's action could proceed). However, the plaintiff does not allege that the defendants fraudulently withheld from him information regarding the illegality of the agreement; rather, he alleges that the defendants entered into the contract knowing that they would not perform their side of the bargain. The plaintiff cannot enforce an illegal contract on those grounds. *See* 8 Williston on Contracts § 19:80; *O'Conner v. Follman*, 747 S.W.2d 216, 222 (Mo. Ct. App. 1988) (applying the principle that "no court will lend its aid to a man who founds his cause of action upon an illegal act" to the plaintiff's fraud action).

If the long-held rule that courts "will not lend their assistance in any way toward carrying out the terms of an illegal contract, and will not enforce *any right* directly springing from such a contract," *Easterly v. Myers*, 148 S.W.2d 640, 643 (Tenn. App. 1940) (emphasis added), could be circumvented by reformulating a contract claim into a tort claim, it would not serve the public

_____

[8]The plaintiff did cite one case for the proposition that a fraud action could survive under the present facts; however, that case did not involve an illegal contract. *See Tenzer v. Superscope, Inc.*, 702 P.2d 212, 218 (Cal. 1985). A promise made without the intention to perform may be actionable in fraud where the underlying contract claim fails for lack of consideration or for failure to comply with the Statute of Frauds, *see* Restatement (Second) Torts § 530, comment c, but that does not mean that such an action can prevail when the subject matter of the underlying contract is barred by law or public policy.

24

interest that the rule was expressly created to protect: to deter the commission of the illegal acts. *See Herbert v. W.G. Bush & Co.*, 298 S.W.2d 747, 752 (Tenn. App. 1956) (holding that "when the public interest demands that an illegal contract be declared void . . . [t]he situation of the parties is immaterial" and "the public interest is paramount"). Accordingly, the court will grant summary judgment on the plaintiff's fraud claim.

## **CONCLUSION**

For the reasons stated herein, the defendant's Motion for Summary Judgment will be granted, and the defendants' Motion to Certify will be denied as moot. The plaintiff's claims will be dismissed.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge